# IN THE UNITED STATES DISTRICT COURT FOR THE
# EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| MICHAEL JOE WILLIAMS, ) <br> ) <br> Petitioner, ) <br> ) <br> v. ) <br> ) <br> JUSTIN JONES,[1] ) <br> ) <br> Respondent. ) | Case No. CIV 03-201-RAW-KEW |

## REPORT AND RECOMMENDATION

NOW before the Magistrate Judge is petitioner's petition for a writ of habeas corpus. Petitioner, an inmate currently incarcerated at Lawton Correctional Facility in Lawton, Oklahoma, attacks his conviction in Okmulgee County District Court Case Number CF-1997-188 for First Degree Murder. He sets forth the following grounds for relief:

- I. Petitioner was prejudiced by the trial court's failure to instruct the jury that the testimony of accomplices required corroboration.

- II. Petitioner was prejudiced by the prosecutor's improprieties during jury selection.

- III. Petitioner was prejudiced by improper admission of a book-in photograph.

- IV. Petitioner was denied his right to effective assistance of trial counsel.

- V. Cumulative error supports reversal of petitioner's conviction.

---

[1] Petitioner named the warden of the private prison where he is incarcerated as the respondent. Because petitioner is incarcerated in a private facility, the proper respondent is Justin Jones, Director of the Oklahoma Department of Corrections. *See Braden v. 30th Judicial Circuit Court of Ky.*, 410 U.S. 484, 494-95 (1973).

The respondent concedes that petitioner has exhausted his state court remedies for the purpose of federal habeas corpus review and has submitted the following records to the court for consideration in this matter:

- A. Petitioner's brief in his direct appeal.

- B. The State's brief in petitioner's direct appeal.

- C. Petitioner's second supplemental brief in his direct appeal.

- D. The State's supplemental brief in petitioner's direct appeal.

- E. Opinion affirming petitioner's conviction and modifying his sentence to life with the possibility of parole. *Williams v. State*, No. F-2000-1247 (Okla. Crim. App. Feb. 18, 2003).

- F. Transcript of petitioner's sentencing proceeding in Okmulgee County District Court Case Number CF-97-188, held on December 2, 1998.

- G. Transcript of petitioner's evidentiary hearing in Okmulgee County District Court Case Number F-2000-1247, held on May 15, 2002.

**Facts**

The facts of this case were summarized by the Court of Criminal Appeals:

> In the early morning hours of June 9, 1997, someone entered Larry Durrett's Okmulgee trailer home and fired three shots at Durrett and his wife Delores while they were in bed asleep. Durrett jumped out of bed and pursued the assailant. Delores heard two more shots, someone leaving the trailer, and a car starting. She went and found her husband standing in the doorway, bleeding from the chest. She ran to the neighbors to call for an ambulance.
>
> Larry Durrett died later at the hospital. The State Medical Examiner testified he had received five gunshot wounds. The cause of death was gunshot wounds to the chest and abdomen. Five bullet casings were found inside the Durrett home by police investigators.
>
> The next day, the Glenpool police pulled over Debra Smith, due to her

erratic driving. [Petitioner] was the front seat passenger. An officer became suspicious when [petitioner] disobeyed orders to stay by the car and attempted to walk behind the officer. [Petitioner] was handcuffed for the officer's safety.

Smith's driver's license was suspended, and she was arrested on that basis. [Petitioner] could not drive, for his license was also suspended, and so the car was impounded. During a license check, the arresting officer learned [petitioner] was wanted for questioning in regard to an Okmulgee homicide.

During the car's inventory, officer's [sic] found a .22 rifle behind the driver's seat, inside a pair of blue jeans. Officers also found a wallet and identification belonging to Stacy Pearce, drug paraphernalia, suitcases packed with male and female clothing, and a newspaper with a story about Durrett's shooting.

A District Attorney's investigator learned the Glenpool police had [petitioner] and Debra Smith in custody and went to interview them. Upon seeing the items inventoried from the car, he obtained a search warrant.

A firearm's [sic] expert found the casings from Durrett's home matched the rifle found in Debra Smith's car. The rifle belonged to Stacy Pearce's mother.

William Ledford, a friend of the deceased, testified that [petitioner] came to his home prior to these incidents asking for Larry Durrett in regard to some red phosphorus for making "dope." Ledford also claimed he helped [petitioner] locate Durrett on the day before the murder. Ledford heard [petitioner] ask about a .22 caliber gun. Upon finding Durrett, Ledford overheard Durrett say to [petitioner], "I heard you was going to shoot me in the back of the head."

Melinda Noies testified that [petitioner] told her Durrett owed him chemicals from a drug deal and that he intended to kill Durrett. Robert Frost, a district attorney's investigator, heard similar statements. [Petitioner] called Frost in May of 1997, seeking to become an informant against Larry Durrett. [Petitioner] said he wanted to set Durrett up or kill him.

When interviewed, [petitioner] claimed Durrett had not held up his end of a drug deal and so he went looking for Durrett on June 8, 1997, accompanied by Bill Ledford and Debra Smith. They met Durrett, who agreed

3

to settle up with them the next day. That evening, Stacy Pearce and [petitioner] met for the purpose of doing crank. They returned to [petitioner's] parents [sic] house at some point that night and discussed going to Kansas to look for a job. [Petitioner] heard from Pearce and Smith two days later. They came and picked [petitioner] up in Tulsa. [Petitioner] was in Pearce's car and transferred two bags from that car into the car that he and Debra Smith were driving when stopped.

Debra Smith was Larry Durrett's former girlfriend and testified she had an ongoing relationship with him until the day he died. Smith also dated [petitioner] during the same time. Smith claimed [petitioner] was jealous about her relationship with Durrett and had threatened to kill them both.

Smith confirmed the story about Durrett not keeping his end of a drug deal with [petitioner] and Stacy Pearce; [petitioner] believed Durrett had shortchanged him. Smith testified [petitioner] had been irate and looking for Durrett for some time, until Bill Ledford led [petitioner] to Durrett the day before Durrett was murdered. Smith heard Durrett ask [petitioner] if he had said he would cut off Durrett's head. [Petitioner] said he had not.

Smith testified that on the evening of June 8, 1997, [petitioner] and Pearce discussed going to Hanna for a drug deal and then, after meeting up with Tony Boswell, discussed meeting "Roley" in Hanna. [Petitioner] and Pearce left at about 10 p.m. and returned about 3:00 a.m. Smith overheard [petitioner] and Pearce discussing how Durrett and Boswell had "screwed" them over on the drug deal. [Petitioner] again threatened to kill Durrett. [Petitioner] and Pearce left, and Smith did not hear from them again until the next afternoon, when [petitioner] called her from Tulsa and asked her to come pick him up.

During their phone conversation, Smith claimed [petitioner] was talking erratically and said she didn't have to be scared anymore. When she asked [petitioner] to explain what he meant, [petitioner] said, "Well, you don't have to worry about him anymore." She was eventually able to get [petitioner] to admit he was speaking of either Durrett or a man named Carl Brock.

Smith packed an overnight bag and drove to Tulsa to pick up [petitioner]. They met at an apartment alone. [Petitioner] was "real antsy." He wanted to watch the news and obtain a newspaper, but would not give Smith any details about what was going on. They got into Smith's car and

[petitioner] fell asleep.

Smith drove to Cubby Shaver's house. Shaver then told Smith he had heard a rumor that Larry Durrett had been shot and killed. Smith claims she got hysterical and "fell apart." When the rumor was confirmed, she went to her car and told [petitioner] what had happened. [Petitioner] got angry with Smith and told her to settle down. According to Smith, [petitioner] then informed her he had shot Durrett. He then dropped Smith off at a friend's apartment.

The next day, June 10, Smith claims she met [petitioner] and Stacy Pearce at the apartment. When she attempted to leave, [petitioner] grabbed and threatened her, saying she was "neck deep in this." [Petitioner] left her with Pearce and took off in Pearce's car. He returned that afternoon and handed Smith a newspaper story about Durrett's murder. [Petitioner] brought the gun and clothes for he [sic] and Pearce. Later that evening, after Pearce had left, [petitioner] began slapping Smith around while she was taking him to Tulsa to drop him off and then go home. She was then pulled over by the Glenpool police, arrested, and charged as an accessory after the fact on the murder.

Stacy Pearce, a co-defendant to the crime of First Degree Murder in this case, testified without any promises or agreements with the D.A.'s office concerning leniency. He and [petitioner] had been friends since high school and had agreed to try to make some money off methamphetamine, with Pearce helping to gather the materials. Debra Smith was also involved and had procured Larry Durrett to manufacture the drugs. But Smith landed in jail, and so [petitioner] wanted to raise money to get her out of jail.

Pearce claimed he, [petitioner], and Durrett agreed that Durrett would make the drugs, they would use the money to get Smith out of jail, and split what was left three ways. But Durrett took the chemicals and left. Pearce claimed [petitioner] was upset by Durrett's actions and said he would kill him.

According to Pearce, he and [petitioner] eventually hooked up with Tony Boswell, who had plans to manufacture drugs in Hanna. [Petitioner], Boswell, and Pearce traveled to Hanna. Pearce brought a .22 caliber rifle because he felt things were not right. Upon arriving, the trio was confronted by a group of people and wound up pouring the chemicals out on the ground. [Petitioner] believed Durrett was behind the incident and that Boswell was

5

involved as well. The trio argued in the car about what Boswell knew and whether Durrett was involved. [Petitioner] put the gun to Boswell's head at one time.

Pearce and [petitioner] then went to Debra Smith's Henryetta apartment, but left again together about 2:30 a.m. They went to Okmulgee, and [petitioner] told Pearce he wanted to go talk to Durrett. Pearce then drove [petitioner] to Durrett's trailer. Pearce claimed [petitioner] took out the gun and stepped out of the car. Pearce believed [petitioner] intended to go kill Durrett.

Not long afterward, [petitioner] opened the car door and said, "Let's get the fuck out of here." As they left, [petitioner] told Pearce he had shot Durrett. They drove to the home of [petitioner's] parents.

[Petitioner's] mother testified she heard [petitioner] on the telephone at her home at 2:30 a.m. on the morning Larry Durrett was killed. She also testified that her husband got up at 5:30 a.m. and found [petitioner] and Pearce drinking coffee at the table. However, her husband had apparently given a statement indicating the time was 3:45 a.m.

*Williams v. State*, No. F-2000-1247, slip op. at 1-6 (Okla. Crim. App. Feb. 18, 2003). Petitioner was found guilty of First Degree Malice Aforethought Murder and sentenced to life imprisonment without the possibility of parole. *Id.* at 1. The state court's factual findings are presumed correct unless the applicant produces clear and convincing evidence to rebut the presumption. 28 U.S.C. § 2254(e)(1).

## Ground I:  Jury Instructions of Accomplice Testimony

In his first ground for relief, petitioner alleges the trial court erred when it failed to instruct the jury that testimony by accomplices Stacy Pearce and Debra Smith required corroboration. On direct appeal the Oklahoma Court of Criminal Appeals found that Pearce was an accomplice as a matter of law, and the court should have given an accomplice as a matter of law instruction regarding Pearce's testimony. *Williams*, slip op. at 8-9. The

6

appellate court further found, however, that failure to give the instruction was harmless, because "'there [was] overwhelming evidence of guilt and the presence of sufficient corroborating testimony.'" *Id.* at 9 (quoting *Cummings v. State*, 968 P.2d 821, 831 (Okla. Crim. App. 1998)).

With respect to Debra Smith, petitioner argued on direct appeal that Smith's complicity was a fact question for the jury, while the State alleged she was not an accomplice at all. *Williams*, slip op. at 8. Smith was not indicted for murder, but as an accessory after the fact. *Id.* The OCCA found that, while the facts surrounding Smith's involvement "certain[ly] give rise to serious suspicions, they do not provide enough evidence to actually indict/charge Smith as an aider and abettor to the crime of murder." *Id.* at 9 (footnote omitted). Consequently, there was no error or plain error in failing to give an accomplice instruction about Smith's testimony. *Id.* "[B]ecause Smith cannot be considered an accomplice to the crime, a juror could infer her testimony was truthful without corroboration, and her testimony could then be used to corroborate Pearce's testimony." *Id.* at 9-10.

The respondent asserts the Oklahoma Court of Criminal Appeals considered and found no merit in this claim in petitioner's direct appeal, and under the revised federal habeas corpus statutes, habeas corpus relief is proper only when the state court adjudication of a claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

In federal habeas review, the admission of evidence is a state law concern, unless the state trial court's decision is an error rising to the level of a due process violation. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). The OCCA found that Debra Smith's testimony was properly admitted, and petitioner has failed to show that the admission of Smith's testimony deprived him of due process.

Regarding Stacy Pearce's testimony, this court applies the harmless error standard set forth in *Brecht v. Abrahamson*, 507 U.S. 619 (1993), and determines whether the error "'had substantial and injurious effect or influence in determining the jury's verdict.'" *Id.* at 637 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). *See also Herrera v. LeMaster*, 301 F.3d 1192, 1200 (10th Cir. 2002) (en banc), *cert. denied*, 537 U.S. 1197 (2003). To warrant relief, petitioner must have suffered "actual prejudice." *Crease v. McKune*, 189 F.3d 1188, 1192-93 (10th Cir. 1999) (quoting *Brecht*, 507 U.S. at 637). "The factors that we consider include the closeness of the case, the centrality of the issue affected by the error, and the steps taken to mitigate the effects of the error." *Fowler v. Ward*, 200 F.3d 1302, 1308 (10th Cir.) (citing *United States v. Nyman*, 649 F.2d 208, 212 (4th Cir. 1980)), *cert. denied*, 531 U.S. 932 (2000), *overruled on other grounds, Moore v. Marr*, 254 F.3d 1235, 1240 (2001).

Here, the court finds the trial court's error did not actually prejudice petitioner. This court agrees with the Court of Criminal Appeals' assessment of the strength of the evidence against petitioner and that the other corroborating evidence was sufficient. *See Williams*, No. F-2000-1247, slip op. at 9. This court further finds the trial court's erroneous ruling on the admissibility of Stacy Pearce's testimony did not have a "substantial and injurious effect or

influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637. Therefore, the Court of Criminal Appeals' decision regarding Pearce's and Smith's testimony was not contrary to or an unreasonable application of clearly established federal law. This ground for habeas relief fails.

## Ground II: Prosecutorial misconduct

Petitioner alleges in Ground II that the prosecutor's extensive questioning during jury selection played upon the emotions and prejudices of the jurors in regard to their personal experiences with murder and drugs. The OCCA found the prosecutor's questions were appropriate and "did not cross any due process or fairness lines by asking potential jurors about their emotional experiences with drugs and murder and whether they could put those aside." *Williams*, slip op. at 10.

In examining habeas claims of prosecutorial misconduct, "it 'is not enough that the prosecutor['s] remarks were undesirable or even universally condemned.'" *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Darden v. Wainwright*, 699 F.2d 1031, 1036 (11th Cir. 1983)). Instead, "[t]he relevant question is whether the prosecutor['s] comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Id.* (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). After a careful review of the record, the court finds the decision by the OCCA was not contrary to or an unreasonable application of federal law, and its decision was not based on an unreasonable determination of the facts. This ground for habeas relief fails.

## Ground III: Book-in Photograph

Petitioner next complains that admission of a book-in photo from the Tulsa County Jail was prejudicial, because it obviously was a police book-in photo and showed his tattoos.

9

The photo was taken when petitioner was arrested, but "that point was not made entirely clear to jurors." *Williams*, slip op. at 11. The OCCA analyzed the claim and denied relief:

> The State claims the photo was relevant because it showed [petitioner] weighed eighty pounds less at the time of the crime. The State also claims the photo was relevant because the murder weapon was found in a pair of blue jeans, which could have been [petitioner's], at a time when he was much lighter. It seems the argument, then, is that the book-in photo was useful circumstantial evidence to establish [petitioner] could have had possession of the gun.
>
> However, we find little, if any, relevancy in the photograph's admission. The blue jeans themselves were not admitted as an exhibit. Instead, we have only a photograph of the jeans, wadded up with the gun sticking out of them. The book-in photograph does not tend to make it more or less probable that the blue jeans were [petitioner's] or that he possessed the gun, for we cannot even determine the size of those jeans. . . . [T]he photograph was not relevant, . . . [h]owever, due to the circumstances shown below, we find the photo's admission was harmless.
>
> A bench conference was had on the admissibility of the photograph prior to the time it was identified at trial. There, defense counsel argued the photo was not relevant to the issue of whether [petitioner] was "skinny enough to fit in the pants that were discovered in the car. The officer can testify to that." Defense counsel also claimed the photo was prejudicial because it displayed [petitioner] in a police setting and showed his tattoos. The trial court, however, ruled the photograph admissible without comment.
>
> Later, when the photograph was shown to a police officer for purpose of showing what [petitioner] looked like at the time he was stopped, defense counsel did not preserve his objection. As the trial progressed, the State really made no attempt to make a connection between [petitioner's] increased weight and the size of the jeans. When the book-in photo was actually offered for admission, defense counsel did not object but merely asked to look at the photo one last time. (Tr. III at 360). He then stated he had "no objections" (although that may have been in reference to other exhibits). Under these circumstances, we review for plain error only.
>
> While the photograph had little or no relevance to any fact of consequence, it also held little, if any, prejudicial impact. The photo shows

> [petitioner] as he appeared on the day of his arrest (June 11, 1997), wearing shorts, a tank top shirt, and sandals. He is standing before a board that measures his height and several of his tattoos are noticeable. It is clear he is at the police department, but that is hardly a revelation.
>
> Plain errors go to the foundation of the case. *Simpson v. State*, 876 P.2d 690, 695 (Okla. Crim. App. 1994). Here, we see only a picture of [petitioner] as he looked on the day of the crime. It hardly can be said that [petitioner] was prejudiced because jurors saw him as he would normally appear. The admission of this photo is error, but it did not take away a right essential to the defense. Its admission was harmless.

*Williams*, slip op. at 11-13 (footnote omitted).

"State court rulings on the admissibility of evidence may not be questioned in federal habeas proceedings unless they render the trial so fundamentally unfair as to constitute a denial of federal constitutional rights." *Brinlee v. Crisp*, 608 F.2d 839, 850 (10th Cir. 1979), (citing *Gillihan v. Rodriguez*, 551 F.2d 1182, 1192-93 (10th Cir.)), *cert. denied*, 444 U.S. 1047 (1980). Here, the court finds the admission of the photograph did not result in a fundamentally unfair trial, and the Court of Criminal Appeals' determination of this issue was consistent with federal law. This ground for habeas relief is meritless.

## Ground IV: Ineffective assistance of trial counsel

Petitioner asserts in Ground IV that his trial counsel was ineffective in failing (1) to request the trial court to properly instruct the jury on accomplice testimony, (2) to object to prosecutorial misconduct during *voir dire*, (3) to renew the objection to the State's book-in photograph, and (4) to carry through with a hearing on petitioner's motion for a new trial.

"There is a strong presumption that counsel provided effective assistance of counsel and petitioner has the burden of proof to overcome that presumption." *United States v. Rantz*, 862 F.2d 808, 810 (10th Cir. 1988) (citing *United States v. Cronic*, 466 U.S. 648, 658

11

(1984)), *cert. denied*, 489 U.S. 1089 (1989). In *Strickland v. Washington*, 466 U.S. 668 (1984), the United States Supreme Court set forth the two-part test for determining the validity of a habeas petitioner's claim of ineffective assistance of counsel:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Strickland*, 466 U.S. at 687.

The OCCA found, and this court agrees, "there was no prosecutorial misconduct, and [petitioner] was not prejudiced by trial counsel's failure to request an accomplice as a matter of law instruction with respect to Pearce or failure to renew his request that the book-in photo be excluded from trial." *Williams*, slip op. at 13. The appellate court further found there was "no reasonable probability that, but for these unprofessional errors, the result of the proceeding would have been different." *Id.* (citing *Strickland*, 446 U.S. at 698) (footnote omitted). The Court of Criminal Appeals' conclusion was not contrary to or an unreasonable application of federal law, and the decision was not based on an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d).

With respect to petitioner's claim that trial counsel abandoned him while his motion for a new trial was pending, the OCCA found the circumstances surrounding the motion and trial counsel's withdrawal were not clearly set forth in the record. *Id.* at 14. The appellate analyzed this claim and a related issue as follows:

> . . . It appears [petitioner's] trial counsel, Fred M. Schraeder, announced at the December 1998 sentencing hearing that he would be

12

representing [petitioner] on appeal. On December 14, 1998, Schraeder filed a notice of intent to appeal. Schraeder later filed a Petition in Error on [petitioner's] behalf on March 15, 1999. (That filing was untimely, however, and the appeal was dismissed by this Court, causing [petitioner] to go through the process of seeking an appeal out of time *pro se*.)

On March 24, 1999, Wesley Montgomery, a DOC prisoner and former cellmate of co-defendant Stacy Pearce gave a handwritten affidavit claiming Pearce told him he committed a murder and someone else had been blamed for it. Schraeder attached that affidavit to a motion for a new trial filed May 26, 1999.

A July 2, 1999, court minute indicates the hearing on the motion for new trial was passed until August 3, 1999. The record suggests no hearing was ever held on the motion. Attorney Schraeder filed a motion to withdraw from the case on August 6, 1999, mailing the same to the district attorney's office the prior day, along with a proposed order. His motion was granted three days later.

Accordingly, this Court ordered the matter to be addressed in an evidentiary hearing, along with other non-record matters raised in [petitioner's] application to supplement the appellate record, or, alternatively, to hold an evidentiary hearing on ineffective assistance of counsel claims, filed pursuant to Rule 3.11(B)(3)(a) & (b), *Rules of the Oklahoma Court of Criminal Appeals*, Title 22, Ch. 18, App. (1999). The evidentiary hearing was held on April 30, 2002, before the Honorable Charles M. Humphrey, District Judge.

Judge Humphrey found Schraeder failed to present the Motion for New Trial to the Court because he had not been fully paid, because he was moving, and because he was curtailing his active criminal law practice at the time. Judge Humphrey noted that Shraeder had testified that he orally advised his client of his withdrawal from the case "which included his representation at the Motion for New Trial." However, Judge Humphrey found there was no written documentation to support Shraeder's claim and that Schraeder had violated a District Court Rule by not sending a copy of his Application to Withdraw or the Order Allowing Withdrawal to [petitioner] by certified mail.

Regarding the merits of the motion for new trial, Judge Humphrey found Wesley Montgomery is a four-time convicted felon, that there was no

> independent corroboration of his statement, no specific details given by Pearce to Montgomery, and no mention of [petitioner]. Judge Humphrey found he would not have granted [petitioner] a new trial on the basis of Montgomery's statement alone.
>
> While the circumstances regarding Schraeder's representation of [petitioner] following trial and his withdrawal from the case are certainly questionable, we cannot say [petitioner] was prejudiced thereby. [Petitioner] was able to have his appeal reinstated following Shraeder's blunder, and [petitioner] was appointed replacement counsel for post-trial purposes. Furthermore, the motion for new trial was based entirely on the word of one jailhouse snitch who allegedly heard unspecific hearsay that did not name [petitioner]. We agree that this lone statement would not have entitled [petitioner] to a new trial.
>
> . . . Shraeder's actions with respect to the motion for new trial and withdrawal from the case, while deficient, did not prejudice [petitioner] to such an extent that would cause his assistance to be considered constitutionally ineffective.

*Williams*, slip op. at 14-16 (footnotes omitted).

This court finds the Court of Criminal Appeals' determination of this issue was in accordance with federal constitutional law. Petitioner was not prejudiced by counsel's alleged ineffectiveness, because a new trial would not have been granted, and petitioner was appointed appellate counsel and allowed to pursue his direct appeal. *See Strickland*, 466 U.S. at 687.

The OCCA also addressed petitioner's claim that his trial counsel pressured him into proceeding to trial, rather than accepting a plea offer:

> One other matter [] was raised in the application for evidentiary hearing (and extensively addressed at that hearing) and gives us greater concern. [Petitioner] claims his trial counsel refused to represent [petitioner] if he accepted the State's plea offer and entered a guilty plea. [Petitioner] claims the State offered [petitioner] a ten (10) year sentence in exchange for a guilty plea to the charge of Manslaughter. He further claims he expressed a desire

14

to accept this plea agreement, but Mr. Shraeder threatened to withdraw from the case if [petitioner] pled guilty on the basis that Shraeder would not have a defendant enter a guilty plea to a crime he maintained he did not commit. . . .

During the evidentiary hearing, Shraeder testified [petitioner] was offered a ten-year sentence in exchange for a plea of guilty to murder (not manslaughter), an offer conveyed to [petitioner] "several times." Shraeder also admitted [petitioner] wanted to take the deal, but Shraeder advised him as follows:

> if he maintained his innocence to me that if he were to, in fact, plead guilty to something that he did not do, that would constitute perjury and I would be suborning perjury and I was not prepared to, based upon what he told me had happened regarding the night of the killing, stand next to him when he perjured himself. . . . The decision to go to trial was entirely his, up to and including the day before and during trial the decision was his. His other option was if he wanted to enter a plea, he was going to have to find someone else to represent him. . . .

Shraeder could not recall if there were ever any discussions with [petitioner] or the district attorney about the possibilities of an *Alford* plea or a no-contest plea, although he thought there probably were. He believed the district attorney's office required a guilty plea and testimony against co-defendant Stacy Pearce.

Clifford J. Smith, then the assistant district attorney handling the prosecution of [petitioner's] murder case, testified the case was difficult, one that could go either way based upon the strength of testimony of dubious witnesses. He personally came to the conclusion that [petitioner] was the shooter and proceeded in that fashion. However, due to the lack of evidence, he made an offer on the eve of trial for a ten-year sentence in exchange for a guilty plea to murder, not manslaughter. He would not consider an *Alford* or no-contest plea because it might compromise his case against Pearce and Debra Smith.

Smith could not remember how long the offer was on the table, . . . [b]ut once trial began, it was no longer available. Smith recalled talking to

15

Schraeder at one point and being told [petitioner] maintained his innocence and therefore rejected the offer. . . .

[Petitioner] testified the offer was communicated to him on the day before trial (he thought it was ten years for a plea of guilty to manslaughter). On this day, Shraeder told him if he wanted to take the deal, he would have to retain another attorney to represent him. [Petitioner] testified he felt pressured by this statement and counsel's statement that he would soon be going home. [Petitioner] testified that he agreed to plead guilty, although he was factually innocent.

[Petitioner's] sister testified she heard this or a similar conversation, although the date was not specified in her testimony. . . . [Petitioner's] wife Diane Williams claimed she heard a similar conversation that occurred during a "break" in the trial, whereby Shraeder was saying he would not stand with [petitioner] at trial if he took the ten-year deal. . . .

Upon hearing all of the evidence at the evidentiary hearing, Judge Humphrey ruled, "Clearly, Shraeder's action in advising his client that he would withdraw from his representation if he entered a guilty plea was highly improper." We agree wholeheartedly with this finding.

However, "[b]ased upon the testimony of Mrs. Williams and the attorney's refusal to testify directly on this point," Judge Humphrey also found Shraeder's improper advice "came after the trial had commenced, and the State's plea bargain had been withdrawn. Therefore, Williams (sic) decision to go to trial was not influenced by the actions of his trial attorney."

We find Judge Humphrey's second conclusion is not fairly supported by the evidentiary hearing record. Shraeder admitted communicating the plea offer to [petitioner] "several" times and that [petitioner] wanted to take the deal, but opted to proceed to trial when told he would have to get a new attorney. All indications are that these conversations took place before "proceeding" to trial.

. . . Schraeder's answer [to Judge Humphrey's inquiry as to whether petitioner wanted to take the deal before the trial began] was evasive . . . and suggests that [petitioner] was made aware, before trial, that he would have to get a new attorney if he wanted to take the plea. Furthermore, Schraeder's August 1, 2000, letter to the Oklahoma Bar Association, in response to the

16

> grievance filed by [petitioner's] sister, clearly indicates that these events happened before [petitioner] proceeded to trial.

*Williams*, slip op. at 16-21 (footnotes omitted).

> We therefore conclude, based upon the entirety of this record, that Shraeder's statements to [petitioner] concerning his withdrawal upon a plea of guilty, occurred before trial, at a time when the plea offer was available.

*Id.* at 22.

> We find Schraeder's ultimatum to [petitioner] concerning the guilty plea--that he would have to obtain new counsel if he desired to accept the ten year deal--amounted to deficient performance under *Strickland*. The matter of prejudice is more difficult, however, for there is no way of determining if a factual basis for the plea would have been established or if the trial judge would have accepted the plea.

*Id.* at 23.

> [T]rial counsel's actions placed [petitioner] in the position of finding another attorney on the eve of trial, paying that attorney with money he did not have (his family having already paid $30,000), and staying in jail until these events could happen, if he wanted to take the ten year deal. Otherwise, he could go to trial and take his chances. The lost opportunity to pursue that plea offer with his retained counsel leads us to conclude [petitioner] has indeed suffered prejudice by his trial counsel's action, for we have no way of reinstating that plea offer, even by reversing this case and remanding it for a new trial.
>
> These unique facts require this Court to modify [petitioner's] sentence. Having considered many possibilities, we find [petitioner's] sentence should be modified to life imprisonment with the possibility of parole.

*Id.* at 24-25.

After careful review, the court agrees with the conclusions by the Court of Criminal Appeals with respect to petitioner's claim about the plea offer. Upon finding that trial counsel was ineffective, and petitioner was prejudiced by that ineffectiveness, petitioner's

17

sentence was modified from life without the possibility of parole to life with the possibility of parole. *Id.* at 25.[2] Sentencing is a matter of state law, *see Shafer v. Stratton*, 906 F.2d 506, 510 (10th Cir.), *cert. denied*, 498 U.S. 961 (1990), and petitioner's modified sentence is within the statutory sentencing range for his crime, *see* Okla. Stat. tit. 21, § 701.9. The Court of Criminal Appeals' resolution, therefore, was not unconstitutional, and does not warrant federal habeas corpus relief. *See United States v. O'Driscoll*, 761 F.2d 589, 599 (10th Cir. 1985), *cert. denied*, 475 U.S. 1020 (1986). *See also Gaines v. Hess*, 662 F.2d 1364, 1370 (10th Cir. 1981).

**Ground V: Cumulative error**

Finally, petitioner alleges cumulative error supports reversal of his conviction or modification of his sentence. The respondent asserts there were no errors at trial that merit relief, so there was no accumulation of error. The Court of Criminal Appeals found this issue did not warrant relief and did not discuss the claim. *Williams*, slip op. at 25.

The OCCA found harmless error in the failure to instruct that Pearce was an accomplice as a matter of law, because of overwhelming evidence of petitioner's guilt. *Id.* at 9. The Court of Criminal Appeals also found the admission of petitioner's book-in photo was harmless, because it merely showed jurors how he normally appeared. *Id.* at 13. The third alleged error regarding the plea offer was found to be prejudicial to petitioner, but the OCCA fashioned a remedy to cure it. *Id.* at 24-25.

> A cumulative-error analysis merely aggregates all the errors that individually have been found to be harmless, and therefore not reversible, and

---

[2] Petitioner does not allege the sentence modification by the Court of Criminal Appeals constituted a denial of his constitutional rights. Even if he were asserting this claim, it has not been exhausted, as required by 28 U.S.C. § 2254(b).

18

it analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless. Unless an aggregate harmless determination can be made, collective error will mandate reversal, just as surely as will individual error that cannot be considered harmless.

*Darks v. Mullin*, 327 F.3d 1001, 1018 (10th Cir.) (quoting *United States v. Rivera*, 900 F.2d 1462, 1470 (10th Cir. 1990)), *cert. denied*, 540 U.S. 968 (2003).

Here, the court finds the sum of the harmless errors did not render petitioner's trial unconstitutional. "No reasonable probability exists that the jury would have acquitted [petitioner] absent the errors." *Darks*, 327 F.3d at 1019 (quoting *Hooper v. Mullin*, 314 F.3d 1162, 1178 (10th Cir. 2000)). Therefore, habeas corpus relief cannot be granted.

**ACCORDINGLY**, the Magistrate Judge recommends that this action be, in all respects, dismissed.

Pursuant to 28 U.S.C. § 636(b)(1)(C) and Local Rule 72.1(C), the parties are given ten (10) days from being served with a copy of these findings and recommendations to file with the Clerk of the Court any objections with supporting briefs. Failure to file timely written objections to the Magistrate Judge's recommendations may result in waiver of appellate review of factual and legal questions. *Talley v. Hesse*, 91 F.3d 1411, 1412-13 (10th Cir. 1996); *Moore v. United States*, 950 F.2d 656, 659 (10th Cir. 1991).

**DATED** this 31st day of July 2006.

KIMBERLY E. WEST
UNITED STATES MAGISTRATE JUDGE